Judjre Ewing
delivered the Opinion of the Court.
Prior to 1782, Henry French executed his obligation to Clough Overton, binding himself to convey to him eight hundred acres of land on Otter Creek, in part consideration for a thousand acres which Clough Overton bound himself to convey to him, on Salt river. Overton was killed at the battle of the Blue Licks, in-1782; but before his death, he made his will, by which he devised the tract on Otter creek to his father, John Overton.— Henry French, with a view to the specific enforcement of his contract for the land on Salt river, being ignorant of the execution of the will, and believing that Richard Overton, the elder brother of Clough, was his heir at law — assigned the plat and certificate of survey for the land on Otter, to him, without his knowledge, participation or consent; and the patent issued in his name.
John Overton devised the land to his wife, Ann B. Overton, and died, in 1796,
Ann B. Overton died in 1814, leaving the complainants and two of the defendants, John and Dabney C. Overton, also Richard Overton, since deceased, her heirs at law.
Richard Overton died in 1816, having first made and published his last will and testament, in which, with respect to- the land on Otter creek, he uses the following language: 44 I will and bequeath to my beloved bro- “ ther Dabney C. Overton, and my beloved sister Poll}'’ 44 Overton, all the land I am possessed of on Otter creek, 44 Hardin county, or that I am interested in, it being my “pari of the tract of land devised by my father, John Over- “ ton, to his wife, Jinn B. Overton, to be equally divided 44 between them.”
*372 John Overton, the younger, took possession of the land under his mother’s title, about 1810, and commenced erecting a mill. Afterwards, he purchased from her, or claims to have purchased, all the land on the east side of Otter creek, and one acre to abut his mill dam against, and also one hundred acres sold by him to Bate, on the west side, and took her bond for a conveyance, but it does not appear that any deed was executed for his purchase during her life. After her death, and the death of Richard, to wit, in 1817, four of the heirs, to wit, George, William, Dabney C. and Mary Overton, recognizing the bon'd of their mother, conveyed to John Overton one hundred and ninety seven acres two. roods and six poles of the land on the east side of the creek, and the acre of ground for an abutment, on the west. The conveyance seems to have been drawn with a view to be executed by all the heirs, but was never signed or executed by the others.
John Overton sold and conveyed the one undivided moiety of this tract, and the mills which he had erected on the same, to Charles Fishback, and conveyed the other half, in trust, to one Shacklett, to secure Woolfolk in the sum of about four hundred dollars, due him — as appears from the proof, though neither Fishback’s nor Shacklett’s deeds are exhibited.
In this state of things, two executions issued from the Hardin^Circuit Court, on replevin bonds — one in favor of Caldwell, the other in favor of Robb, against John Overton as principal, and Mary Overton and Dabney C. Overton as his sureties, both amounting to a little upwards of three hundred dollars, and- were levied upon the interest of John, on the east side of the creek, and of Mary and Dabney C. on the west side, which were sold, except one hundred and fifty one acres of the interest of Mary and Dabney C., tovbe taken off the west end of the tract; and Woolfolk became the purchaser, subject to his trust upon the interest of John, and the sheriff executed a deed to him. ■
The sale was made in 1819. Woolfolk, by suit in ejectment against John and Dabney C., recovered a judgment, and was put into possession of the undivided *373 half of John’s interest on the east side of the creek, and of Dabney C. and Mary’s interest on the other side, in 1826.
One holding a title bond, died, having devised the land to his father; who devised it to his wife, and died; but the obligor in the bond, believing that a bro ther of the obligee was his heir, and entitled to the land, assigned the to him, and to him the patent issued, but this was done without his knowledge, and he never .claimed the land under the patent, but, on the contrary, admitted that it belonged, first, to his father, then to his mother: under these circumstances, the legal title was held in trust, for the father and those claiming under him; and neither the statute of limitations at law, nor lapse of time in chancery, will apply to bar a suit for partition, by some of the heirs of the mother (last devisee,) against their co heirs, and against a purchaser in possession deriving title from the mother, through another heir.
In 1827, the bill in this case was filed by the complainants, part of the heirs of Ann B. Overton, and who are also heirs of Richard Overton, deceased, against John and Dabney O. Overton, the other heirs, (Mary Overton having died without issue, intestate,) and Woolfolk and French’s heirs, for a partition of the eight hundred acres of land, and for general relief.
The Circuit Court dismissed the complainant’s bill, as to Woolfolk, and as to the whole tract, except the one hundred and fifty one acres excepted out of the sale by the sheriff, and decreed that to be divided among the heirs; and the complainants have appealed to this Court.
In support of the decree of 'the Circuit Court, it is contended, on the part of the appellee, Woolfolk:— First — that the statute of limitation, or lapse of time, bars the. remedy of the complainants.
Second — that Woolfolk being in the adverse possession, a suit in equity for a partition will not lie, until the possession is recovered at Jaw.
Third — that the title of the complainants is doubtful and suspicious, and has been denied by Woolfolk, and therefore they should be left to their remedy at law.
First. There is no pretext for the application of the statute of limitation. The legal title was vested in Richard Overton, through mistake, without his knowledge or consent, and against his will, and he never claimed it as his property, or exercised any dominion or control over it, as such, but always, up to his death, recognized the right of his father and mother to the land; and when he died, in 1816, (having, only about two years before, entered on the land, claiming only his part as *374 one of the heirs of his mother,) he devised, as will be more fully shown hereafter, only his part as one of her heirs. Though the legal title- was in him, he held it in trust for the rightful proprietors, and never claimed title, or held the possession adversely to them for a'day. Under those circumstances, at law, the statute would not run, neither should it, or lapse of time, be permitted to bar in chancery.
The bare fact, that a part of the land of which partitio nis sought by bill in ch y, is adversely held by one joint-tenant ortenantin-common, will not prevent the court from taking jurisdiction to decree the partition, before the controvery as to the title is settled at law.— Courts of Equity act upon the title--compelling conveyances in severalty, to those entitled to partition; and, in order to end the controversy, will compel surrenders of possession, in conformity to the conveyances. — Hence, it is said, an averment of possession only, M a bill frir partition, without an averment of title, is insufficient.
A mere denial by the def’t to a bill for partition, of title in the eompt's, is, by itself, no ground for dismissing the bill; but, as courts of law, and chancery, have concurrent jurisdiction in such cases, and the former are the most appropriate tribunals for the trial- of legal rights — if the title be really doubtful or suspicious, the court of equity will dismiss the bill, leaving the eompt s to their remedy at law; or will retain it until the title has been tried & determined at law. But—
*374 Second. We know of no adjudged case, in which the principle has been settled, that the bare fact of an adverse holding of a part of the land, by one joint-tenant or tenant-in-common, would be a good ground to defeat the jurisdiction of a court of equity, in a bill for partition, until after the right to possession was settled at law; nor do we believe that policy or principle would require the adoption of such a rule. It would tend to circuity of action, and useless litigation, which is not favored by the chancellor, who delights to do final and complete justice at once.
A court of equity acts upon the title, and compels a conveyance in severalty, to each of the tenants, of the parts alloted' to each, and, as incident to this power, and as a means of rendering the title of each complete, and winding up the whole controversy, may act upon the tenants, and compel them to surrender the possession, according to the partition, in the same manner that it can compel a surrender of possession in a case where there is a decree for a conveyance, in the specific enforcement of a contract. And it is said that in a bill for partition, the allegation of possession, is not sufficient, but the allegation of title is required. 2 Akyns, 382, Cartwright vs. Poultney, Amb. 236, Parker vs. Gerard. The title is the principle thing enquired into in chancery, which draws after it the possession.
But there is more weight in the third objection.
In the case of the Bishop of Ely vs. Kenrick, Bunb. 322, the bill, for partition, was dismissed, because the title was denied. But we think that case is not sustained by the policy or reason of the law. If a bare denial of the title, when there was no reasonable doubt or suspicion attending it, would authorize the dismissal of the com *375 plainants’ bill, it would place this equitable jurisdiction, which has been established by a long train of decisions, and is deemed of much public convenience, at the mercy of every profligate- or unconsciencious defendant, and render the Court the mere ministerial agent to carry .into effect the wishes of the parties, in cases where there were no matters of controversy between them.
Where the title set up by the comp t (in a bill for partition,) is equitable only, the court will retain the bill, decide the controversy as to titles, and give re Vide post. p. lief. So also, where the titles are in part equitable, and ill part legal, 377.
But as the jurisdiction of the chancellor is concurrent with a court of law, and as remedy may be afforded at law, when the complainants have the legal title, and as that tribunal is more appropriate for the trial of legal rights — in this, as in all other cases, where there is a legal remedy, and the title is doubtful or suspicious, the complainant will be left to his remedy at law. Cartwright vs. Poultney, 2 Atkyns, 380; Blyman vs. Brown, 2 Vern. 232; Parker vs. Gerard, Amb. 236; Wilkin vs. Wilkin, 1 John. Chy. 117; Phelps vs. Green, 3 John. Chy. 204; Coxe vs. Smith, 4 John. Chy. 271; Baring vs. Nash, 1 Vesey & Beames, 557; Madock's Chy. 244.
But in cases where the extent of the rights or interest of the parties is doubtful, or not well ascertained, the court will direct a reference to a master, to enquire and report, as the estate and interest of the parties must be first ascertained, before a commission to make partition will be awarded. Agar vs. Fairfax, 17 Vesey, 533; Phelps vs. Green, 3 John. Chy. 304.
And when the legal title is doubtful, the chancellor will sometimes retain the cause for a reasonable time, to enable the parties to settle their titles at law, Blyman vs. Brown, 2 Vern. 232; Parker vs. Gerard, Amb. 236; 1 John. Chy. 118, Wilkin vs. Wilkin; note 1 to Goodright vs. Wells, Doug. 773.
But when the title set up by complainants or defendants is equitable only, the chancellor will retain the cause, and afford relief, though there are doubts and difficulties in the title, as such titles are peculiarly- cognizable in equity, and a court of law cannot afford complete redress. Cartwright vs. Poultney, 2 Atkyns, 380; Coxe vs. *376 Smith, 4 John. Chy. Rep. 276. So it would seem to be proper when the title is in part equitable and in part legal> or when the title of a part of the claimants is equitable, and of a part legal, for the chancellor to retain the cause^ an¿ ma]ie partition, compelling those in whom the legal title rests, to convey according to the partition awarded. As, in such cases, a court of law not having the power to take cognizance of the equitable interests, could not do final and full justice between the parties.
A woman died possessed, as devisee of her husband, ofan equitable title to a tract of land, the legal title have by mistake Steri her son, who heirs on the sim died, leaving a deviseed Wal his interest in that ther ’ and sister, by the descripland_on a Otter creek &c. that I it being part of devised by in ther to his wife:” devise* was Intended to convey, ly dsuchP part or interest in the visor had inherited as an heir of his mother* not the legal títie which had ly vested in him; of dw hichr revised, descended to his heirs.A tocnfambi guity as to the subject matter of a will, may be explained by extraneous evidence.
To apply these principles to the case under consideration, it will be first necessary to enquire into the nature of the titles m contest.
That the equitable title for the whole tract was in , „ _ 1 ...... . . . , , Ann B. Overton, m her lifetime, cannot be doubted; nor can ^ doubted, that it passed by her death, to her heirs. The legal title, in the mean time, with equal certainty, was in Richard Overton, her son, during his life. At his death, without issue, had there been no dev'se made by him, it would have passed to his brothers and sisters and their representatives, who were also the only heirs of his mother. In that event, the legal and equitable title having united in the same persons, their tides would have been complete without the aid of a court of equity.
ButRichard Overton made a will, by which he devised interest to Dabney C. and Mary Overton. And the question occurs — what interest did he devise, or intend to devise? We are clear that he devised, and intended to devise, only his own part, as one of the heirs of his mother. The language of the will is clear on this subject. It recognizes the right of his mother to the land, as devised to her by his father, and claims, under her, an interest in it, not the whole, and devises his part only to ^ " Mary and Dabney C. What interest or pari did he mean? Clearly not the whole, but only the part, which he, in common with his brothers and sisters, inherited from mother. The words are clear, and if there be any ambiguity, it is a latent one, relating to the subject matter Revise, and, as such, is subject to be explained and applied by extraneous proofs and circumstances. 3 *377 Starkie, 1000. When these proofs and circumstances are referred to, it will be perfectly clear what interest and part he intended to devise. To say that he intended to devise the whole would be to-contradict his uniform disclaimer of right in himself, as well as his uniform recognition of the right of his mother, repeated even in his last solemn act, his will, and in the very clause in which he makes a devise of an interest in this very land.
Facts as the titles, and jurisdiction to dedrec a partition; defective preparation, &c.
There being nine heirs, or stocks, of Ann B. Overton, the legal title of the one ninth part only of the land, which was Richard’s part, passed by his will to Dabney C. and Mary; and the legal title of the residue passed to the eight surviving heirs, or their descendants. And had there been no sale or disposition of any part of the tract, by Ann B. Overton, in her life time, the equitable title, as to the residue, to the same extent, would have passed to the same heirs, and the legal and equitable title, having united, have become complete in each, and left no difficulty, doubt or uncertainty with respect to the title, or the extent of the interest of each.
But it appears in the record, that John Overton purchased from his mother, just before her death, all the land that lies on the east side of the creek, together with one acre for an abutment for his mill dam, and one hundred acres sold by him to one Bate, on the west side, and received her bond for a conveyance. She having only an equitable title, could pass no other to him, though she had made a deed. But it does not appear that any deed was made. John Overton, therefore, held only an equity to the land purchased, and the legal title was in Richard Overton, and passed, at his death, to his heirs generally, and remains there still, from any thing that appears in this record, except as to six ninth parts, to-wit: his own and that of the four heirs who conveyed to him after the death of his mother, and the part before devised by Richard to two of them, which also passed by the conveyance of his two devisees, Dabney C. and Mary. But for John’s purchase, we should regard the title as free from doubt or difficulty; and as to the whole residue of the tract, except as to the part *378 embraced in his purchase, we find no difficulty in the title, and a partition might be decreed. And as to the part purchased, and not consummated into a legal title by the foregoing deed, or held by John by descent from Richard, the title seems to be still equitable, and, consequently, cognizable only in a court of equity; and though doubts may arise, as complete remedy cannot be afforded at law, the chancellor should go on to investigate the title, and do full and final justice to all the parties.
In a suit in equity, for partition, the holders of controverted legal titles, and of all equitable interests, trustees, &c. must be brought before tihe court.
If the sale from Ann B. to John Overton, was bom fide and valid, and he had an equitable right to enforce it, specifically, then the land embraced in the sale is not subject to partition among her, or Richard’s,heirs, whether the equity remained in John, or was passed by him to others. But there seems to be no specific allegation, admission or denial, in the bills, answers, or cross-bills, with respect to this sale; nor any issue formed in the pleadings about it. The bill seems to go for a partition of the whole eight hundred acres, but yet does not controvert the sale, or admit it. Nor is there any survey made exhibiting the parts sold. Hence it becomes extremely difficult to make a final disposition of the case, without danger of doing injustice to some of the parties.
But whether the sale is admitted, or denied, or is valid, or invalid, as it seems that John Overton has passed a moiety of his purchase on the east side of the creek to Fishback, and a part, if not all, his purchase on the west side to Bate, or Bate and Grue, they are interested in -the controversy, and should be brought before the .Court, unless the two latter have released, about which there are some vague suggestions in one of the depositions of John Overton. And if they have released, it should be shown how, and to whom, and when, and what was the extent of their purchase and release, to enable the Court to understand more fully the extent of the purchase of Woolfolk under the executions.
It will also be necessary to bring Shacklett, the trustee in the deed of trust from John Overton to him, for '.the benefit of Woolfolk, before the Court,
Conclusions, on facts, as to the extent of title acquired by W. by his purchase-under execution. Land was sold. atasheviff ssale, to which the defendant in the execution had, in. fact, only an equitable title; & he, afterwards,-, sold' all his interest to another Purchasel. But the purchaser at the ex on sale, having brought ejectment against the def’t in the ex’on, and others in possession, recovered the land. Afterwards, in a suit for partition among heirs, of a tract of land including the thus the parcel sold, the vendee of the defendant in the execution (who had purchased his interest after the execution sale) filed a cross billcontrovertingthe validity ofthesale under the execution, and claiming the land. But the court, considering the question of title as settled by the action of ejectment,- in which it was necessarily involved, will not entertain the cross bill to retry that question, as between them, or any claiming under either of them; nor deprive the execution purchaser of his legal advantage, by compelling the holders of the legal title to convey it to his adversary — especially, as no tender to refund the purchase money had been made; and. more especially, as the execution purchaser was advised to make the purchase, by the party, now claiming against him — which gives him a rebutting equity.
If the sale from Ann B. to John Overton shall be found to be valid, and equitably binding upon the heirs, then, as the complainants have no interest in the land sold, it can be of no consequence to them, whether the purchase made by Woolfolk of John Overton’s interest in the same, was regular or irregular, legal or illegal. That is a matter between him and Woolfolk entirely, and to be settled between them.
But if the sale should be determined to be invalid, and not equitably binding upon the heirs, then will those heirs who have not joined in the conveyance to John Overton, or parted with their title in the land claimed to be sold, have a right to their full share of that, as well as the residue of the land in the partition.
1But as Fishback and Woolfolk each claim under John, and the latter in part under Mary and Dabney C. and to the extent of their rightful claim, have a right to stand in their places in the partition, assuming that John’s purchase was valid, it will be necessary to enquire whether their purchases were valid, and to what land or interest they extend.
With- respect to Fishback’s claim, we cannot determine, as he is not before the Court, nor is his deed exr hibited. ^Nor would it be absolutely necessary to deteiv mine in relation to the validity or extent of Woolfolk’s claim or purchase, as no issue is made up between him. and John on that subject. But as John, after the sheriff’s sale, and after the recovery in ejectment upon it, has executed his bond to Dabney C., to convey to him all his interest in the land, except the one acre on the west side of the creek for an abutment, and as Dabney C. has filed his answer, making it a cross bill against John and Woolfolk, impeaching the validity of the sale, and setting up claim to- the interest of John, it becomes *380 necessary that some disposition should be made of this branch of the case.
We have no doubt that Woolfolk is, by his purchase under the executions, entitled at least to all the interest then held by Mary and Dabney C. Overton, on the west side of the creek, with the exception of their interest in the one hundred and fifty one acres, to be taken off the west side of the tract, not sold. And that their interest, including the part of Richard devised to them, was three ninths. To which three ninths, with the above exception, Woolfolk has a clear right, and should be protected, at least to that extent, in the partition. It also seems to us, from the best view which we can now give of the subject from its present preparation, without intending this view to be conclusive, in the absence of Fishback’s deed, (which is referred to as the basis of the sheriff’s deed, with respect to the extent of Woolfolk’s purchase,) that the sheriff’s levy and sale were made upon the idea that John Overton still held, under his purchase from his mother, an undivided moiety of the boundary embraced in the deed to Fishback, and that that, or at any rate only the interest of John on the east side of the creek, together with the acre for an abutment on the west side, was sold or intended to be sold as John’s interest in the eight hundred acres; and that Mary and Dabney C. Overton held the whole interest on the west side of the creek by devise from Richard, and that their interest, on that side only, and not John’s, was intended to be sold. This view is strengthened by the fact, that the sheriff’s deed refers to the deed from Ann B. Over-ton, as described in the deed to Fishback, as descriptive of the interest of John, which was sold, and the exception of the west end of the tract, is made in favor of Mary and Dabney C,, and not in favor of John, which indicates that the land on the west side was sold as the land of Mary and Dabney C., and not as John’s, and the interest of John Overton in it was not intended to be sold. And this view is fully sustained by the parol proof in the cause. All the witnesses concur in stating that John’s interest on the east side of the creek only, was cried and sold, including the mills, and Mary’s and Dab *381 ney C.’s, on the opposite side. This being' the correct view, John’s interest on the west'side^ except the abutment to the mill dam, not being sold, Dabney C. by virtue of his bond upon John, has a right, in,'-the partition, to John’s undisposed of interest on the west side.
In relation to the validity of the sale under execution, of John’s interest on the east side of the creek, if it were an open question,, for the first time'-presented for the consideration of the Court, and attended with no peculiar circumstances, we might be constrained to pronounce it irregular and illegal, and that pothing passed by it. At the time of the sale John had acquired the legal title, as before stated, only to six ninths of the land on the east side of the creek, and though his purchase from his mother be admitted to be valid,- he had acquired only the equity to the other three ninths, whether he had or had not acquired a deed from her, as her title was only equitable. An equity was not subject to execution; therefore, as to three ninths, the sale passed no title. Besides, it seems that John Overton, prior to the sale, had made a deed of-trust for the land to Shacklett, for the benefit of Wooifoik, to secure the payment of about four hundred dollars; the-legal title if any, therefore, vested in Shacklett, and Overton’s equity of redemption, or other equitable- interest in -the same, was not, at that time, liable to execution.
But as Wooifoik has recovered the land from John Overton, under his purchase in an action of ejectment at law, in which form of .action the legal title is brought in issue, and he could not have recovered but upon the presumption of legal title in him; and as that judgment-stands in full force against John Overton, unreversed and annulled, we do not feel warranted as Chancellors, in a proceeding for partition, to revise or overhaul that decision, or retry the title, which was thus brought in litigation at law between Wooifoik and John-Overton, either as to them, or any person afterwards, deriving title under either of them.
* This Court, as a court of equity, will not, therefore, upon the cross bill of Dabney C. Overton, as a purchaser from John, upon a proceeding for partition,take *382 from Woolfolk any legal advantage which he may have acquired, (and especially, when no tender has been made to restore the money which he has advanced in his purchase and on his deed of trust,) by compelling the heirs in the partition, to invest him with the legal title to that part. And the more especially, when it appears that John Overton advised and encouraged Woolfolk, at the sale, to bid for the land, which may be relied on as a rebutting'equity, against any claim in chancery, set up on the part of John, or any other claiming under him, against the validity of the title, and which, if proven, in the action of ejectment, was sufficient to authorize a recovery as to John’s interest.
Therefore, at any rate, in the present attitude of the case, and in its present preparation, we do not feel warranted in overhauling the sale, as to the undivided half of the tract embraced in the deed to Fishback, lying on the east side of the creek mainly, and including the mills, so far as John Overton, or any person claiming under him, may be concerned.
It is, therefore, the opinion of the Court, that the decree of the Circuit Court be reversed, and the cause remanded, that further proceedings may be had not inconsistent with this opinion.