JUDGE LINDSAY
delivered the opinion op the coukt.
The rights of the parties to this suit must to a very great extent depend upon the legal relationship existing between John Ewing and Esther in June, 1851, when it is claimed that the former intermarried with the appellant Jane. Being slaves in 1824, John and Esther could not have contracted under the laws of Kentucky a legitimate marriage, nor could their cohabitation and recognition of each other in a state of slavery as husband and wife constitute their union even a marriage de facto. (Stewart v. Munchandler, 2 Bush, 278.) But, considering the anomalous status of persons held as slaves, such unions or quasi marriages were in no sense either impolitic or vicious. Neither the parties thereto nor their offspring could acquire any legal rights under such connections; but this was owing entirely to the legal disabilities imposed upon such persons by positive law, and not because such unions were in violation either of the laws of God or of the state. Hence when the quasi husband and wife by their emancipation became competent to contract marriage, the highest duty which they owed to themselves, their children, and to morality was to consummate and make perfect a union which had hitherto existed only by reason of the consent and approbation of their owners.
Esther became a free woman in 1836, and John was emancipated February 25, 1850. From that day forward for more than a year they continued to reside together as man and wife, and held themselves out to the world as such. They each by their daily conduct and conversation ratified and confirmed the relationship existing between them during the twenty-five years preceding John’s emancipation. This all occurred before the adoption of the Revised Statutes, and *657 while the common law, in so far as it declared a contract of marriage per verba de prcesenti, which was afterward consummated by cohabitation, a marriage de faeto, was still in force in Kentucky.
From and, after February 25, 1850, John and Esther were both free persons, legally competent to contract marriage; and although there is nothing in the record conducing to shots that they attempted to conform to the statutory regulations relating to the manner in which such contracts should be legally consummated, yet there is enough to show that they were willing to ratify and confirm, and actually did ratify, the contract made years before, and which was not valid or binding at the time only by reason of the fact of the legal incapacity-of the parties to contract at all. Under the laws of Kentucky at that time the consent of the parties might be declared before a magistrate or simply before witnesses, or subsequently confessed or acknowledged, or it might be inferred from continual cohabitation as husband and wife, except in cases of civil actions for adultery, or in public prosecution for bigamy or adultery. (2 Kent’s Commentaries, side-page 88.)
From this it seems clear that although mere cohabitation and reputation as husband and wife would not, under the common law nor under the then laws of this state, afford sufficient evidence of marriage to sustain a prosecution for bigamy, yet that these circumstances, taken in connection with the confession or declarations of the parties, would so far render the first marriage valid as to make the second legally void, if not criminal. And we are therefore of the opinion that the pretended marriage between John and Jane Barnett, which took place in June, 1851, Esther being at the time alive, was void in law; and as Esther outlived John, and as they were never legally divorced, it consequently follows that Jane was not at the time of his death, nor at any time, John’s lawful wife.
*658 From the repeated statements of John it is satisfactorily established that the lot conveyed to him by Henry Cox was paid for with the money of Jane, and that the agreement between the parties at the time of the purchase was that the title was to be conveyed to Jane; but that through some mistake the conveyance was made to John. These statements or admissions of John, which are clearly proved, are binding upon the appellees, who claim title to the property as heirs at law of the party making them.
The purchase of the lot and the conveyance to John were made in March, 1852, prior to the adoption of the Revised Statutes. Consequently, as the purchase price was paid by •Jane, who was a feme sole, and not the wife of John, a trust resulted in her favor, which was enforceable as against him in a court of equity while living, and which will be upheld as against his widow and heirs at law now that he is dead. (Chaplin’s adm’r v. McAfee, 3 J. J. Marshall, 515; Overton’s heirs v. Woolfolk, 6 Dana, 373.)
This conclusion renders it unnecessary to inquire into the legitimacy of the children born to John and Esther while slaves, but who were recognized by them after the parents and children had all become free, as the lot in question must, in any view of the case, be adjudged to be the property of Jane Barnett, the party for whose benefit John held the legal title.
Wherefore the judgment in favor of John’s children, Elizabeth Bibb and Harriet Gray, is reversed, and the cause remanded with instructions to dismiss their petition, and for further proper proceedings to quiet Jane’s title, and to correct any mistake which may have been made by her vendor Cox in the description of the lot.